UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VINCENT BRUCE,

              Plaintiff,

    v.

SHAMA CHAIKEN, et al.,

              Defendants.

No. 2: 15-cv-0960 TLN KJN P

ORDER AND FINDINGS AND
RECOMMENDATIONS

I.  Introduction

      Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  Pending before is defendants' motion for summary judgment.  For the reasons stated herein, the undersigned recommends that defendants' motion be granted in part and denied in part.

      This action proceeds on the original complaint as to defendants Chaiken, Bell, Bobbola, Nangalama, Clingman and Ikegbu.  The complaint clearly states four claims for relief: 1) inadequate medical care in violation of the Eighth Amendment against all defendants; 2) retaliation in violation of the First Amendment against defendants Bobbala, Nangalama and Clingman; 3) negligence against defendants Bobbala, Nangalama, Clingman and Ikegbu; and 4) infliction of emotional distress against defendants Bobbala, Nangalama, Clingman and Ikegbu. (ECF No. 1 at 11-12.)

1

In his opposition, plaintiff agrees to voluntarily dismiss defendants Bal and Chaiken. (ECF No. 51 at 57.)  Accordingly, these defendants are dismissed.

Defendants move for summary judgment with respect to plaintiff's Eighth Amendment claims against defendants Clingman, Bobbala, Nangalama and Ikegbu.  (ECF No. 37-2 at 16-25.)  Defendants argue that they are entitled to qualified immunity as to plaintiff's Eighth Amendment claims.  The summary judgment motion does not address plaintiff's retaliation and state law claims.  Accordingly, the undersigned does not address the retaliation and state law claims in these findings and recommendations.

Defendants' summary judgment motion also does not address plaintiff's claim that defendant Nangalama violated his Eighth Amendment rights by approving his transfer back to Pelican Bay State Prison ("PBSP").  (ECF No. 1 at 9, ¶ 68.)  Plaintiff alleges that, "[t]he approval included medically clearing plaintiff without any examination or tests."  (Id.)  The undersigned does not address that claim in these findings and recommendations.

Other than those claims noted above that are not addressed herein, the undersigned recommends that defendants' summary judgment motion be granted except for the following claims:  1) defendant Nangalama violated the Eighth Amendment when he required plaintiff to self-administer the enema; and 2) defendant Ikegbu violated the Eighth Amendment when she failed to treat plaintiff's prostate related complaints on September 11, 2013.

II.  Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

56(c)).

"Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

////

3

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on July 17, 2015 (ECF No. 12), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

III. Background

A. Plaintiff's Claims

This action proceeds on plaintiff's original complaint. (ECF No. 1.) Plaintiff alleges that on July 12, 2013, he began a hunger strike while housed at PBSP. (Id. at 2-3.) On August 23, 2013, plaintiff was transferred to California State Prison-Sacramento ("CSP-Sac"). (Id. at 3.)

The hunger strike ended on September 4, 2013.  (Id. at 5.)

On September 4, 2014, after ending the hunger strike, plaintiff told defendant Clingman that he could not resume eating because his bowels were blocked due to severe constipation.  (Id.) Defendant Clingman told plaintiff that he could not be constipated because there was nothing in his bowels.  (Id.)  Plaintiff told defendant Clingman that he could feel the obstruction in his bowels, and requested to be seen by a doctor.  (Id.)  Although there was a physician assigned to plaintiff's housing unit, plaintiff was not allowed to see the physician.  (Id.)

On September 5, 2013, defendant Bobbola saw plaintiff.  (Id.)  Plaintiff allegedly told defendant Bobbala that he had severe constipation.  (Id.)  Plaintiff told defendant Bobbola that he thought that eating would cause additional injury.  (Id.)  Defendant Bobbola refused to treat plaintiff's obstructed bowels, and expressed anger that plaintiff was refusing to eat unless treated. (Id. at 6.)  Defendant Bobbola conducted no tests.  (Id.)

A few hours later, defendant Clingman told plaintiff that if he would eat, she would provide him with a stool softener.  (Id. at 6.)  Plaintiff agreed to eat.  (Id.)  Defendant Clingman made clear that plaintiff would not be prescribed the stool softener unless he started eating.  (Id.) Without speaking with or examining plaintiff, defendant Nangalama prescribed a stool softener. (Id.)

On September 6, 2013, plaintiff requested to see a doctor.  (Id.)  Defendant Nangalama saw plaintiff.  (Id.)  Plaintiff allegedly told defendant Nangalama that the stool softener was not working, and that plaintiff could not have a bowel movement due to the size and hardness of the obstruction.  (Id. at 7.)  Defendant Nangalama prescribed an enema for plaintiff.  (Id.)  Defendant Nangalama commented that he did not want to perform the enema.  (Id.)

Plaintiff alleges that he "was brought two small enema bottles containing a pint of water to administer himself without supervision or instruction."  (Id.)  Plaintiff could not successfully administer the enema because he had difficulty putting the bottles behind his back and his arms were not long enough.  (Id.)

By midnight, plaintiff felt excruciating pain.  (Id.)  At 1:00 a.m., plaintiff could not urinate and felt pain in his bladder.  (Id.)  Plaintiff attempted to have a bowel movement for the next

several hours.  (Id. at 8.)  At 4:00 a.m., plaintiff had a painful bowel movement.  (Id.)  Plaintiff alleges that there was blood in the toilet.  (Id.)  Plaintiff's rectum was in severe pain, and the bleeding continued for weeks.  (Id.)

In the morning, plaintiff told the nurses making the morning rounds that his rectum was torn and bleeding.  (Id.)  Plaintiff asked to see a doctor.  (Id.)  Over the next three days, plaintiff told several nurses, including defendant Clingman, that he needed to see a doctor about his torn rectum.  (Id.)

On September 7, 2013, plaintiff submitted a sick call request, but was not seen by a doctor.  (Id.)

On September 10, 2013, plaintiff was transferred back to PBSP.  (Id.)  When plaintiff arrived at PBSP, he allegedly had fecal matter and blood in his shorts.  (Id. at 9.)  Plaintiff asked to see a doctor about his torn rectum.  (Id.)  Defendant Ikegbu saw plaintiff several days later.  (Id.)  Plaintiff told defendant Ikegbu that he had a torn rectum that bled every time he passed solid waste, and caused severe pain.  (Id.)  Defendant Ikegbu refused to treat plaintiff's torn rectum.  (Id.)

Plaintiff alleges that the only treatment he received for his rectum was a visual inspection by a nurse.  (Id.)  Plaintiff told the nurse and defendant Ikegbu that the tears were inside his rectum, but they refused to confirm this fact.  (Id. at 10.)

Plaintiff provided defendant Ikegbu with two stool samples with blood in them.  (Id.)  Defendant Ikegbu claimed on one occasion that there was no blood in the sample.  (Id.)  She attributed the blood in plaintiff's stool in the other sample to something other than the rectal tears.  (Id.)

Plaintiff alleges that as a result of the untreated severe constipation at CSP-Sac, he still suffers pain and problems with his prostrate and bladder.  (Id.)

IV.  Motion to Strike

Defendants move to strike supplemental declarations and new evidence submitted by plaintiff in support of his response to defendants' supplemental reply.

////

A. Background

Defendants filed the pending summary judgment motion on September 28, 2016. (ECF No. 37.) On April 3, 2017, plaintiff filed his opposition, addressing the merits of defendants' summary judgment motion. (ECF No. 51.) However, plaintiff also requested that defendants' motion be stayed so that he could obtain an expert. (Id. at 16-17.) On April 27, 2017, defendants filed a reply to plaintiff's opposition, a reply to plaintiff's statement of undisputed facts, an opposition to plaintiff's request for judicial notice, an opposition to plaintiff's request to strike expert testimony, and an opposition to plaintiff's request for a stay. (ECF Nos. 55, 56, 57, 58.)

On June 1, 2017, plaintiff filed the declaration of his expert, Dr. Edward Mallory. (ECF No. 60.) On June 5, 2017, plaintiff filed a motion for leave to file Dr. Mallory's declaration, a motion for leave to file a supplemental opposition and a supplemental opposition. (ECF Nos. 61, 62.)

On July 27, 2017, the undersigned granted plaintiff's request to stay defendants' summary judgment motion, nunc pro tunc. (ECF No. 68.) The undersigned granted plaintiff's motions to file an expert witness declaration and supplemental opposition. (Id.) The undersigned also ordered defendants to inform the court within twenty-eight days whether they wished to reopen discovery with respect to Dr. Mallory's declaration. (Id.)

On August 23, 2017, defendants informed the court that they wished to take Dr. Mallory's deposition. (ECF No. 69.) On August 31, 2017, the undersigned vacated defendants' summary judgment motion and granted defendants eighty days to depose Dr. Mallory. (ECF No. 70.) The undersigned also ordered defendants to inform the court, within one hundred days, whether they wished to file a new summary judgment motion or a supplemental reply. (Id.)

On December 7, 2017, defendants informed the court that they wished to file a supplemental reply. (ECF No. 75.) On December 12, 2017, the undersigned reinstated defendants' summary judgment motion and granted defendants thirty days to file a supplemental reply. (ECF No. 76.) The undersigned ordered that if defendants presented new evidence in the supplemental reply, plaintiff could file a response to the supplemental reply within thirty days thereafter. (Id.)

On January 10, 2018, defendants filed a supplemental reply, which referenced the transcript from Dr. Mallory's deposition. (ECF No. 77.) On May 21, 2018, plaintiff filed a supplemental declaration by Dr. Mallory. (ECF No. 86.) On May 25, 2018, plaintiff filed a response to defendants' supplemental reply, which included a supplemental declaration by plaintiff and new evidence. (ECF No. 87.)

On June 4, 2018, defendants filed the pending motion to strike the supplemental declarations by Dr. Mallory and plaintiff, and the new evidence, filed in support of plaintiff's response to defendants' supplemental reply. (ECF No. 88.)

B. <u>Analysis</u>

In the motion to strike, defendants correctly observe that the order allowing a supplemental reply did not contemplate the presentation of new evidence in plaintiff's response to the supplemental reply. (ECF No. 88.) Defendants also argue that allowing consideration of the declarations and evidence submitted by plaintiff in support of his response would prejudice defendants. (<u>Id.</u>)

Defendants are unable to respond to the new evidence raised in what is, in essence, plaintiff's sur-reply to defendants' supplemental reply. This "sur-reply" is the equivalent of raising new facts in a reply brief, which is not permitted. <u>See</u> <u>Provenz v. Miller</u>, 102 F.3d 1478, 1483 (9th Cir. 1996) ("Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond" (internal quotation marks and alterations omitted)). The undersigned is not inclined to grant defendants an opportunity to file a response to plaintiff's response to the supplemental reply. Both parties have already submitted extensive briefing. In addition, allowing further briefing would further delay resolution of the pending summary judgment motion.

Accordingly, defendants' motion to strike the declarations and new evidence submitted in support of plaintiff's response to the supplemental reply is granted.

////

////

V. Legal Standards

    A. Legal Standard for Eighth Amendment Claim Alleging Inadequate Medical Care

A prisoner's claim of inadequate medical care does not constitute cruel and unusual punishment in violation of the Eighth Amendment unless the mistreatment rises to the level of "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). Deliberate indifference may be shown by the denial, delay or intentional interference with medical treatment or by the way in which medical care is provided. Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988). The two-part test for deliberate indifference requires plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096.

A defendant does not act in a deliberately indifferent manner unless the defendant "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "Deliberate indifference is a high legal standard," Simmons v. Navajo Cty. Ariz., 609 F.3d 1011, 1019 (9th Cir. 2010); Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and the indifference caused harm. Jett, 439 F.3d at 1096.

In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105–06). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir.

1990).

Further, a "difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012) (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082–83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122–23 (9th Cir. 2012) (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).

B. Legal Standard for Qualified Immunity

Government officials enjoy qualified immunity from civil damages unless their conduct violates clearly established statutory or constitutional rights. Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When a court is presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001), receded from, Pearson v. Callahan, 555 U.S. 223 (2009) (the two factors set out in Saucier need not be considered in sequence).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011). The existence of triable issues of fact as to whether prison officials were deliberately indifferent does not necessarily preclude qualified immunity. Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1053 (9th Cir. 2002).

"For the second step in the qualified immunity analysis−whether the constitutional right was clearly established at the time of the conduct−the critical question is whether the contours of

the right were 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Mattos v. Agarano, 661 F.3d 433, 442 (9th Cir. 2011) (quoting al−Kidd, 563 U.S. at 741) (some internal marks omitted). "The plaintiff bears the burden to show that the contours of the right were clearly established." Clairmont v. Sound Mental Health, 632 F.3d 1091, 1109 (9th Cir. 2011). "[W]hether the law was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition." Estate of Ford, 301 F.3d at 1050 (citation and internal marks omitted).

In making this determination, courts consider the state of the law at the time of the alleged violation and the information possessed by the official to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal. Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007); see also Hope v. Pelzer, 536 U.S. 730, 741 (2002) (the "salient question" to the qualified immunity analysis is whether the state of the law at the time gave "fair warning" to the officials that their conduct was unconstitutional). "[W]here there is no case directly on point, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" C.B. v. City of Sonora, 769 F.3d 1005, 1026 (9th Cir. 2014) (citing al−Kidd, 563 U.S. at 740). An official's subjective beliefs are irrelevant. Inouye, 504 F.3d at 712.

VI. Defendants' Argument that Plaintiff Caused His Own Damages

At the outset, the undersigned addresses defendants' argument that plaintiff caused his constipation and related injuries by voluntarily participating in the hunger strike. (ECF No. 37-2 at 18.) Defendants argue that plaintiff was aware of the risk of constipation when he participated in the hunger strike. (Id.) Thus, defendants argue, no defendant caused plaintiff's harm relating to constipation or rectal tears. (Id.) On these grounds, defendants move for summary judgment.

Defendants cite no persuasive authority in support of the argument that they did not violate plaintiff's Eighth Amendment rights by failing to treat plaintiff's constipation and rectal tears, because plaintiff caused these conditions. Defendants' claim that they are entitled to summary judgment because plaintiff caused the constipation and rectal tears is without merit and requires no further discussion.

VII.  Defendants Clingman, Bobbala and Nangalama

    A.  Undisputed Facts

Plaintiff participated in a hunger strike from July 12, 2013 to approximately September 4, 2013, when protestors agreed to end the strike.  (ECF No. 37-3 at 3; ECF No. 51 at 2-4.)  Plaintiff had participated in at least four other hunger strikes while incarcerated.  (ECF No. 37-3 at 3; ECF No. 51 at 61.)  On August 23, 2013, plaintiff was transferred from PBSP to CSP-Sac for medical reasons.  (ECF No. 37-3 at 3; ECF No. 51 at 2.)

On September 4, 2013, plaintiff saw defendant Nurse Clingman.  (ECF No. 37-3 at 3; ECF No. 51 at 61.)  The parties dispute whether plaintiff told defendant Clingman that he was constipated or severely constipated.  (ECF No. 37-3 at 3; ECF No. 51 at 62.)  Plaintiff told defendant Clingman that he would not start eating again until he saw a doctor.  (ECF No. 37-3 at 3; ECF No. 51 at 62.)

Plaintiff's constipation was likely caused by his hunger strike, because lack of food for such a significant period of time is a direct cause of constipation.  (ECF No. 37-3 at 3; ECF No. 51 at 62.)

On September 5, 2013, plaintiff was seen by defendant Dr. Bobbala.  (ECF No. 37-3 at 3; ECF No. 51 at 3.)  Defendant Dr. Bobbala diagnosed plaintiff at "high risk of refeeding syndrome," a syndrome that may occur after patients who have been starved or severely malnourished being taking nourishment again.  (ECF No. 37-3 at 3; ECF No. 51 at 63.)  Symptoms of refeeding syndrome include imbalances in electrolytes and fluids, which can increase cardiac workload and heart rate.  (ECF No. 37-3 at 4; ECF No. 51 at 63.)  Possible complications from refeeding syndrome include severe dehydration, kidney injury, cardiac arrhythmia and death.  (ECF No. 37-3 at 4; ECF No. 51 at 63.)

On September 5, 2013, plaintiff was prescribed Colace, a stool softener, and milk of magnesia.  (ECF No. 37-3 at 4; ECF No. 51 at 62-63.)

On September 6, 2013, defendant Dr. Nangalama continued the prescription for Colace and prescribed an enema for plaintiff to self-administer.  (ECF No. 37-3 at 4; ECF No. 51 at 63.)  On September 6, 2013, plaintiff did not have paralysis, severe tremors or incontinence, which

1    would have indicated that he might have had difficulty administering an enema.  (ECF No. 37-3

2    at 4; ECF No. 51 at 64.)

3          The parties do not dispute that plaintiff had a bowel movement.  Defendants do not

4    address when this occurred.  In his complaint, plaintiff alleges that he had his bowel movement at

5    approximately 4:00 a.m. on September 7, 2013.  (ECF No. 1 at 8.)

6          On September 9, 2013, plaintiff submitted a health care request form complaining of

7    "rectal tears and cuts and what feels like hemrroids [sic] which makes bowel movement

8    painful…I need some medication to heal and protect against infection and I may need to call the

9    rape-crisis hotline as I am feeling violated here by my traitorous body."  (ECF No. 37-3 at 4; ECF

10   No. 51 at 65.)  Plaintiff sketched a "smiley face" at the end of the last sentence.  (ECF No. 37-3 at

11   4; ECF No. 51 at 65.)

12         Plaintiff was transferred back to PBSP on September 10, 2013.  (ECF No. 37-3 at 4; ECF

13   No. 51 at 65.)

14         B.  Defendant Bobbola

15         Defendants argue that defendant Bobbola did not act with deliberate indifference when he

16   prescribed Colace (a stool softener) and Milk of Magnesia (a laxative) on September 5, 2013.  In

17   response, plaintiff argues that defendant Bobbola did not prescribe Colace on September 5, 2013.

18   Plaintiff also argues that even if defendant Bobbala did prescribe Colace and Milk of Magnesia

19   on that date, defendant Bobbala wrongly diagnosed him with constipation.  Plaintiff argues that

20   he had fecal impaction, and that a stool softener was not the appropriate treatment for this

21   condition.

22         *Defendants' Evidence*

23         The undersigned first discusses defendants' evidence submitted in support of the summary

24   judgment motion with respect to defendant Bobbala.  In his declaration, defendant Bobbala states,

25   in relevant part,

26                 3.  I examined Mr. Bruce on September 5, 2013 at 10:00 a.m.  He
                   indicated that his last bowel movement had been three weeks before
27                 that day, and he reported that he had been on a hunger strike since
                   July 12, 2013.  I took a detailed history and noted that he had
28                 constipation.  I diagnosed Mr. Bruce as at a "high risk of re-feeding

                                            13

syndrome," meaning that he was at risk of suffering medical complications relating to his refusal to eat for nearly two months. Those complications can include severe electrolyte imbalance, severe dehydration, kidney injury, ketoacidosis, cardiac arrhythmia and death. A true copy of my record for that examination, "PCP Note: Mass Hunger Strike Participant," dated September 5, 2013, is attached as Exhibit 1.

4. After the September 5, 2013 examination, I issued orders for Mr. Bruce to increase his fluids, and issued prescriptions for Colace (a stool softener) and Milk of Magnesia (a laxative) to treat constipation, and a potassium-phosphorus replacement. Mr. Bruce was under close observation to prevent the above-mentioned complications from his hunger strike. I instructed Mr. Bruce to submit a health care services request if he experienced any new complaints, including weakness, confusion, vomiting, abdominal pain, dizziness, or headaches. I also ordered that Mr. Bruce be examined by a physician again the next day, September 6, for a follow-up. A true copy of my September 5, 2013 order is attached as Exhibit 2.

5. On the day of my examination, Mr. Bruce did not demonstrate any signs or symptoms of bowel obstruction.

6. Based on my professional training and experience, the prescriptions that I provided to Mr. Bruce were medically appropriate to treat his condition. Because Mr. Bruce had not eaten in nearly two months, stronger laxatives might have caused him to become dehydrated or caused an electrolyte imbalance.

(ECF No. 37-6 at 2.)

Defendants also provided a declaration by their medical expert, Dr. Kumar. (ECF No. 37-10.) In relevant part, Dr. Kumar states that defendant Bobbala appropriately treated plaintiff's complaints of constipation with Colace and Milk of Magnesia. (Id. at 6.) Dr. Kumar states that management of plaintiff's constipation was "substantially complicated" by the fact that plaintiff had not eaten in almost two months. (Id.) Dr. Kumar states that strong laxatives could have caused plaintiff to become dehydrated, possibly interfered with his electrolyte levels, and possibly caused death. (Id.) In Dr. Kumar's opinion, it was appropriate that plaintiff was not initially provided with medications other than Colace and Milk of Magnesia. (Id.) Dr. Kumar states that after the laxatives did not work, defendant Nangalama appropriately prescribed an enema. (Id.)

////

////

////

14

*Did Defendant Bobbala Prescribe Colace and Milk of Magnesia on September 5, 2013?*

As discussed above, plaintiff argues that defendant Bobbala did not order stool softeners or laxatives on September 5, 2013. Plaintiff claims that defendant Bobbala refused to treat his bowel impaction on September 5, 2013. Plaintiff claims that defendant Nangalama prescribed Colace and Milk of Magnesia on September 5, 2013.

The September 5, 2013 entry in plaintiff's medical records, containing defendant Bobbola's signature, indicates that he prescribed Colace and Milk of Magnesia, aka "MOM." (ECF No. 37-6 at 8.) In his declaration filed June 1, 2017, Dr. Mallory states that the medical records indicate that defendant Bobbala prescribed Colace and Milk of Magnesia on September 5, 2013. (ECF No. 60 at 4.)

Plaintiff's claim that defendant Bobbala failed to prescribe Colace and Milk of Magnesia on September 5, 2013 is contradicted by the medical records as well as the declaration of plaintiff's own expert. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a summary judgment motion." Scott v. Harris, 550 U.S. 372, 380 (2007); Nails v. Haid, 2016 WL 4180973 at *7-9 (C.D. Cal. 2016) (on summary judgment, audio recordings, medical records and booking photographs "blatantly contradicted" the plaintiff's version of events, rendering the plaintiff's version "so utterly discredited by the record that no reasonable jury could believe him"). Accordingly, the undersigned finds that it is undisputed that defendant Bobbala prescribed Colace and Milk of Magnesia on September 5, 2013.

*Did Dr. Bobbola Act with Deliberate Indifference by Prescribing Colace and Milk of Magnesia on September 5, 2013?*

At the outset, the undersigned observes that in his opposition, plaintiff appears to argue that defendant Bobbala should have prescribed laxatives and stool softeners while he was still fasting, i.e., before September 5, 2013. This claim is not raised in the original complaint. Defendants' summary judgment motion does not address this claim. Plaintiff may not raise new claims in his opposition to defendants' summary judgment. Accordingly, the undersigned does

15

not address this new claim in these findings and recommendations.[1]

Turning to the merits, plaintiff alleges that on September 5, 2013, he suffered from fecal impaction, rather than constipation. Plaintiff argues that defendant Bobbala should have ordered treatment other than Colace and Milk of Magnesia to treat his fecal impaction. In the declaration filed June 1, 2017, Dr. Mallory addresses this claim:

> 27. The standard of care for treating constipation depends on the severity of the constipation, which can range from mild to severe constipation. Fecal impaction is one example of a type of severe constipation. Based on Mr. Bruce's complaints and descriptions of symptoms it is obvious that he suffered from fecal impaction. Fecal impaction refers to a condition where the stool becomes very firm in the rectum and makes it difficult or impossible to pass. In this case, it became stuck because the stool had become harder, drier, and larger than normal. This would be consistent with Mr. Bruce's participation in a 54-day hunger strike. Fasting causes dehydration, and dehydration can cause the stool to become hardened and dry, resulting in fecal impaction.
>
> 28. In treating the fecal impaction, the standard of care involves first, diagnosing the severity of the fecal impaction. Given Mr. Bruce's statements to medical staff about his history of developing severe constipation and enlarged stools that tore open his rectum, and his current complaints of inability to have a bowel movement, a preliminary diagnosis of fecal impaction/severe constipation should have been made. A reasonable, conscientious physician would conduct a well-documented medical history, especially of previous bouts of constipation, and order an x-ray to confirm the presence and location of the stool. The x-ray and digital rectal exam would confirm the size, density and severity of the fecal impact.
>
> 29. Once the existence of fecal impaction is confirmed, urgent treatment is required as a fecal impaction if left untreated can cause severe pain, serious injury, and ultimately result in the patient's death, often in a matter of days. Any physician practicing in the United States would have received education and training on the dangerous complications of fecal impaction.
>
> 30. The standard of care for fecal impaction would begin with conservative treatment and close monitoring. Medications such as a stool softener should be given once or twice daily, and if a bowel movement is not produced, a 1 liter soap suds enema and/or oil retention enema should be administered by medical personnel, to

---

[1] As noted by defendants in the reply, Dr. Kumar states that plaintiff's constipation was complicated by the fact that plaintiff had not eaten in almost two months. (ECF No. 37-10 at 6.) Dr. Kumar states that strong laxatives could have caused plaintiff to become dehydrated, possibly interfered with his electrolyte levels, and possibly caused death. (Id.) Thus, even if the court addressed plaintiff's new claims, it is not clear to the undersigned that prescribing laxatives to an inmate actively engaged in a hunger strike is medically appropriate.

16

> produce a bowel movement.  This can be repeated up to 3 bags of fluids.  If the medication and enemas are unsuccessful, then the doctor can digitally break up and remove the stool.  If the patient is experiencing increasing pain and abdominal pain and pressure, digital removal of the impaction is advised, especially if the patient's physical condition is in a weakened state due to prolonged fasting and medically administered enemas did not work.

(ECF No. 60 at 5-6.)

Assuming plaintiff had fecal impaction, the evidence suggests that, at most, defendant Bobbala negligently diagnosed plaintiff with regular constipation.  Defendant Bobbala, who examined plaintiff, stated in his declaration that plaintiff had no symptoms of bowel obstruction.  Dr. Mallory, who did not examine plaintiff on September 5, 2013, opined that plaintiff had fecal impaction based on plaintiff's complaints and description of his symptoms.

A negligent diagnosis does not violate the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992) (explaining that negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights), rev'd on other grounds, WMX Tech., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).  The record contains no facts from which it can be inferred that defendant Bobbala acted with deliberate indifference in diagnosing plaintiff with constipation.

Moreover, in his declaration Dr. Mallory states that the conservative treatment, provided by defendant Bobbala, was within the standard of care for treating fecal impaction.[2]  In the supplemental reply, defendants also observe that at his deposition, Dr. Mallory testified that treatment with Colace was appropriate before resorting to other treatments.

---

[2]   The undersigned observes that in his supplemental declaration filed May 21, 2018, Dr. Mallory states that fecal impaction should initially be treated with an enema, rather than milk of magnesia and Colace.  (ECF No. 86 at 5.).  This statement contradicts Dr. Mallory's opinion in his declaration filed June 1, 2017, that treatment for fecal impaction should initially start with conservative treatment, such as stool softeners and laxatives.  As discussed above, defendants' motion to strike Dr. Mallory's May 21, 2018 supplemental declaration is granted.

17

Q: Do you agree that providing Colace is an attempt to address Mr. Bruce's complaints of constipation?

A: Well, it's a –it's a beginning. It's definitely not the whole treatment, but it's definitely a beginning.

Q: Is that a "yes"?

A: It is one of the many things that can be used to treat constipation.

Q: Do you agree that Milk of Magnesia is an attempt to address a complaint of constipation?

A: Yes.

Q: Do you agree that Colace and Milk of Magnesia may appropriately be used to address complaints of constipation before resorting to other treatments?

A: Yes.

Q: Would you consider Colace and a stool softener conservative treatment?

A: Yes.

Q: And beginning with conservative treatment is appropriate to treat – to treat constipation; is that correct? I'm sorry. Let me rephrase that. Is it appropriate to begin with –well, is it appropriate to begin with conservative treatment to treat constipation?

A: Yes.

Q: Let's assume that Dr. Bobbala had done an x-ray and it showed that Mr. Bruce had a serious constipation issue. It would still be appropriate to begin with conservative treatment; correct?

A: It's a good starting point, yes.

(Mallory Deposition, pp. 46-47.)

Thus, according to plaintiff's expert, plaintiff's treatment would have been no different had defendant Bobbola diagnosed him with fecal impaction on September 5, 2013.

In his June 1, 2017, declaration, Dr. Mallory states that defendant Bobbala should have also ordered an x-ray and performed a digital rectal exam to determine the size, density and severity of the fecal impact. Defendant Bobbala's records from September 5, 2013, state that plaintiff refused a physical examination. (ECF No. 37-6 at 5.) In his opposition, plaintiff alleges that he did not refuse any examination. (ECF No. 51 at 4.)

Dr. Mallory's opinion that plaintiff required further testing is based on his opinion that plaintiff suffered from fecal impaction. In other words, Dr. Mallory does not claim that a person diagnosed with regular constipation requires this further testing. Because the undersigned finds that defendant Bobbala did not act with deliberate indifference in diagnosing plaintiff with constipation, the undersigned finds that defendant Bobbala did not act with deliberate indifference by failing to order the further testing, according to Dr. Mallory, required for people diagnosed with fecal impaction.

Finally, the undersigned notes that in his complaint, plaintiff also alleges that defendant Bobbala wrongly conditioned the prescription for Colace and Milk of Magnesia on plaintiff's agreement to resume eating. Plaintiff alleges that eating would make his fecal impaction worse. The undersigned clarifies that at the time defendant Bobbala saw plaintiff on September 5, 2013, the hunger strike had ended. In other words, plaintiff is not claiming that he was wrongly forced to end the hunger strike to receive medical care.

Defendants do not directly address plaintiff's claim that requiring plaintiff to resume eating made his fecal impaction worse. However, in his declaration, Dr. Kumar states that plaintiff agreed to start eating on or about September 4 or 5, 2013. (ECF No. 37-10 at 3.) Dr. Kumar also cites the September 5, 2013 refeeding order for plaintiff, which indicated that medical staff planned to slowly introduce food after the hunger strike. (Id. at 3-4.) Dr. Kumar states that, "Dr. Bobbala appropriately treated his complaints of constipation with Colace and Milk of Magnesia." (Id. at 6.) It is reasonable to infer from this evidence that Colace and Milk of Magnesia were properly prescribed in conjunction with the refeeding order.

Plaintiff has presented no expert evidence supporting his claim that his alleged fecal impaction should have been resolved before he started eating again. Thus, plaintiff has not met his summary judgment burden of presenting evidence supporting his claim that his alleged fecal impaction should have been resolved before he resumed eating. Accordingly, defendant Bobbala should be granted summary judgment as to this claim.

For the reasons discussed above, the undersigned recommends that defendant Bobbala be granted summary judgment as to plaintiff's Eighth Amendment claim.

*Qualified Immunity*

Because the undersigned finds that defendant Bobbala did not violate plaintiff's constitutional rights, no further discussion of qualified immunity is warranted.

C. Defendant Nangalama

The undersigned herein clarifies plaintiff's claims against defendant Nangalama, some of which are clarified in Dr. Mallory's declaration.

Plaintiff alleges because he had fecal impaction, rather than regular constipation, defendant Nangalama should have performed the enema himself. Plaintiff also argues that defendant Nangalama should have performed the enema himself because plaintiff was physically incapable of performing it. Plaintiff also alleges that defendant Nangalama should have performed additional tests, including x-rays and a digital exam. Finally, plaintiff alleges that defendant Nangalama failed to order adequate monitoring of plaintiff while he attempted to self-administer the enema.

1. Defendants' Evidence

In his declaration, Dr. Nangalama states, in relevant part,

> 3. I examined [plaintiff] on September 6, 2013. Mr. Bruce complained of constipation post-hunger strike. He indicated that he had been prescribed Milk of Magnesia with no relief. He was not experiencing nausea, vomiting, or fever, which would have indicated a condition that was more severe than routine constipation. I continued a prescription for Colace, which he had already been prescribed, and prescribed a Fleets Enema # 2. I also indicated that the patient required follow-up with a nurse…

> 4. I prescribed many enemas to inmate-patients while I was a staff physician with the California Department of Corrections and Rehabilitation. In my experience, inmates without serious conditions affecting motor function are generally able to self-administer.

> 5. When I examined him on September 6, 2013, Mr. Bruce did not have a condition such as paralysis, severe tremors, or incontinence that would have indicated difficulty with self-administration.

> 6. Based on my training, the treatment that I provided Mr. Bruce was medically appropriate.

(ECF No. 37-9 at 2.)

////

In his declaration, Dr. Kumar, states that defendant Nangalama appropriately prescribed an enema as a progressive measure, when the stool softener and laxative did not work. (ECF No. 37-10 at 6.)

2. Should the Enema Have Been Performed by Medical Personnel Because Plaintiff Had Fecal Impaction?

At the outset, the undersigned clarifies that plaintiff and defendants agree that an enema was the proper course of treatment after the medication did not cause a bowel movement. Defendants argue that because plaintiff suffered from regular constipation, prescription of the self-administered enema was appropriate. Plaintiff argues that medical personnel should have administered the enema because he suffered from fecal impaction. In his June 1, 2017 declaration, Dr. Mallory states that plaintiff had fecal impaction, and an enema should be administered by medical personnel for someone suffering from fecal impaction. (ECF No. 60 at 5-6.)

As with plaintiff's claims concerning defendant Bobbala discussed above, the undersigned finds that, at most, plaintiff has shown that defendant Nangalama acted negligently in allegedly misdiagnosing him with constipation rather than fecal impaction. Estelle, 429 U.S. at 106 (negligent diagnosis does not violate the Eighth Amendment); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992) (explaining that negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights), rev'd on other grounds, WMX Tech., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

Defendant Nangalama diagnosed plaintiff with routine constipation because plaintiff did not have symptoms indicative of a more severe condition. Both Dr. Mallory and defendant Nangalama agree that nausea, vomiting and fever, which plaintiff did not have, would indicate that plaintiff had a condition more serious than constipation. (See Mallory Deposition Transcript at 43; ECF No. 37-9 at 2 (Nangalama declaration).) The record contains no evidence from which it may be inferred that defendant Nangalama acted with deliberate indifference when diagnosing plaintiff with regular constipation. Accordingly, the undersigned finds that defendant Nangalama did not violate plaintiff's constitutional rights when he prescribed the self-administered enema

based on his diagnosis that plaintiff suffered from regular constipation.

Related to plaintiff's claim that defendant Nangalama should have ordered medical personnel to perform the enema because plaintiff had fecal impaction, is the claim raised in Dr. Mallory's declaration that defendant Nangalama should have performed further testing, including x-rays and a digital examination. According to Dr. Mallory, this additional testing was warranted because plaintiff had fecal impaction. Assuming defendant Nangalama misdiagnosed plaintiff with regular constipation, defendant Nangalama's failure to order additional testing demonstrates negligence, at best. Accordingly, defendant Nangalama should also be granted summary judgment as to this claim.

### 3. Was Plaintiff Physically Capable of Self-Administering the Enema?

Plaintiff alleges that defendant Nangalama acted with deliberate indifference when he prescribed the self-administered enema because plaintiff was physically incapable of self-administering the enema.

*Did Defendant Nangalama Have Knowledge that Plaintiff Could Not Perform the Enema?*

As indicated above, in his declaration, defendant Nangalama states that plaintiff did not have a condition such as paralysis, severe tremors, or incontinence that would have indicated difficulty with self-administration.

In his verified declaration submitted in support of his opposition, plaintiff states that he told defendant Nangalama that he could not reach behind his back without pain and difficulty:

> 31. I asked defendant Nangalama if he could "give me an enema or something" and he replied that he could manually break-up and remove the stool or give me an enema, but "I do not like doing those things." He said, "I prefer to let you handle your own stool," and chuckled again. He looked over at the nurse, and commented, "and I am sure she doesn't want to do it either," and they both began chuckling.
>
> 32. Defendant Nangalama said he was going to prescribe some enema bottles and I could give myself an enema. I informed him that I could not reach behind my back without pain or difficulty. He replied in an irritated manner that I would just have to do the best I can.

(ECF No. 51 at 7.)

*////*

22

Plaintiff goes on to state that he tried to use the enema bottles but it was extremely difficult because of the difficulty putting his arms behind his back.  (Id. at 8.)  Plaintiff also states that his arms were not long enough to use the bottles.  (Id.)  Plaintiff states that most of the fluid remained in the bottle or ran down his legs.  (Id.)  Plaintiff describes what happened after he could not perform the enema:

> 40.  I could not expel the hardened stool no matter how hard I strained and the pain and pressure in my bowels and abdomen built to an excruciating level.
>
> 41.  Shortly after midnight, I could no longer urinate and got scared as I recalled what defendant Nangalama said.  My bladder had filled up and was adding to my excrutiating pain. I sat down on the toilet and strained for the next four hours to pass the stool obstruction.
>
> 42.  I tried to summon a nurse or guard at the point my bladder felt like it would burst.  But no one came.
>
> 43.  In a state of panic, I made a superhuman effort to push out the hardened stool and a huge long piece of stool came out that was about 12 inches long and nearly thick as a soda can and hard as wood.  There was a pool of blood in the toilet – at least a cup worth of blood.

(Id.)

In the reply, defendants claim that at his deposition plaintiff testified that he agreed to self-administer the enema.  Defendants argue that no medical evidence supports a conclusion that defendant Nangalama knew or should have known that plaintiff's range of motion difficulties rendered him unable to administer an enema.

At his deposition, plaintiff testified about his discussion with defendant Nangalama regarding self-administering the enema:

> Q:  Did you explain to the doctors that you had limited range of motion in your shoulders?
>
> A:  Yes.  And it's documented in my medical file.
>
> Q:  What did they say about your limited range of motion?
>
> A:  Vague as to time.
>
> Q:  Well, when they provided the enema, my understanding is that you said:  Look, I can't use the thing.  I have limited range of

23

motion in my shoulders. What was the doctor's response?

A: He didn't really want to have to do it himself. He explained he could do it, but he didn't want to do it. He didn't want to – he said he could go in there himself and manipulate it and break it up, whatever that means, but he'd rather not. He kind of make it like a little joking way that he doesn't like touching people's feces. So he asked me to try the enemas. I said I would.

(Plaintiff's Deposition at 95.)

The undersigned does not agree with defendants' characterization of plaintiff's deposition testimony regarding his agreement to self-administer the enema. Plaintiff testified that he told defendant Nangalama that he could not perform the enema himself due to limited range of motion in his shoulders. Only after defendant Nangalama allegedly told plaintiff that he, defendant, did not want to perform the enema, did plaintiff agree to try it himself. Without further explanation from defendant Nangalama regarding this alleged conversation with plaintiff, the undersigned cannot find that defendant Nangalama did not act with deliberate indifference when he allegedly allowed plaintiff to attempt to self-administer the enema after plaintiff told him that he did not think he could do it.

*Was Plaintiff Physically Capable of Performing the Enema?*

Defendants also argue that plaintiff's symptoms were not so severe as to preclude self-administration of the enema. Defendants cite a medical record for plaintiff dated September 11, 2013. (ECF No. 37-10 at 47.) The record states that plaintiff sought renewal of his ibuprofen for chronic bilateral shoulder pain. (Id.) The medication was discontinued while plaintiff was on the hunger strike. (Id.) Plaintiff reported increased pain when lifting his shoulders above his head and back. (Id.) The record also stated that plaintiff reported a full range of motion. (Id.)

Defendants also cite a medical record from November 6, 2013, stating that plaintiff complained of left shoulder pain. (Id. at 90.) The report states that plaintiff had mild tenderness on palpating his left shoulder and full range of motion. (Id. at 91.)

In the reply, defendants argue that Dr. Mallory's deposition testimony indicates that plaintiff's self-administration of the enema was appropriate. Citing page 52 of Dr. Mallory's deposition, defendants claim that Dr. Mallory testified that it would be appropriate to allow a

patient to self-administer an enema when he agreed to do so and a patient is able to administer it. Citing pages 48-50 of Dr. Mallory's deposition, defendants claim that he testified that it would be possible for a patient with full range of motion in his arms to self-administer an enema, and that bilateral shoulder pain and stiffness would not necessarily make it impossible to self-administer an enema, rather it would depend on the severity of the symptoms. Citing page 51 of Dr. Mallory's deposition, defendants claim that Dr. Mallory testified that the only basis for his opinion that plaintiff suffered from bilateral shoulder pain and stiffness in September 2013 was his conversations with plaintiff.[3]

Attached to plaintiff's opposition as an exhibit is a medical chrono dated July12, 2012. (ECF No. 51 at 26.) This chrono states that plaintiff has "difficulty putting hands behind back due to long-standing shoulder pain (both) … decreased ROM" (range of motion). (Id.) The duration of this chrono, which provides for limited duty, is permanent. (Id.)

The undersigned also observes that medical records attached to Dr. Kumar's declaration indicate that plaintiff was seen for shoulder injuries. A medical record indicates that plaintiff was seen for a left rotator cuff strain. (ECF No. 37-10 at 83.) The record states that plaintiff was diagnosed on August 4, 2010, and that the condition was "resolved" on August 13, 2013. (Id.) Another record states that plaintiff was diagnosed with "right trochanteric bursitis/ … chronic tendonitis/left shoulder pain." (Id.) Plaintiff was diagnosed with these conditions on December 7, 2011, and the condition was "resolved" on May 25, 2012. (Id.) Another record states that on February 21, 2013, plaintiff was diagnosed with "bilat sholder OA," an orthopedic disorder. (Id. at 84.) The record indicates that this condition has not been resolved. (Id.)

Plaintiff's medical records indicate that he suffered from chronic shoulder problems which limited his mobility. The records are somewhat conflicting as to the degree and frequency

---

[3] In response to defendants' supplemental reply, plaintiff attached an "accommodation chrono" dated December 2013. (ECF No. 87-1 at 9.) The chrono states that plaintiff should receive double cuffs and no over the head work. (Id.) In his supplemental declaration, plaintiff states that the special cuffing chrono required correctional officers to use waist restraints with single handcuffs on each side of his torso. (Id. at 2.) Plaintiff states that this cuffing procedure prevented pain that arose from reaching behind his back when he was restrained. (Id.) As discussed above, the undersigned granted defendants' motion to strike this new evidence.

of these mobility limitations. On the one hand, plaintiff has a permanent limited duty chrono based on difficulty putting his hand behind his back due to long standing shoulder pain in both shoulders. On the other hand, plaintiff's medical records from September 11, 2013 and November 6, 2013 report that plaintiff had full range of motion. At his deposition, plaintiff testified that he could not perform the enema due to his limited range of mobility:

> Q: The complaint indicates that you feel they should have provided the enema for you. Is there any physical reason why you couldn't have done it yourself?
>
> A: Yeah. I have problems reaching – I have shoulder issues – reaching behind my back. When I tried to put the enema in –it's a bottle, and it has a long spot. I couldn't get it in there. My arms weren't that long.
>
> Q: Do you have limited range of motion in your shoulders?
>
> A: Yes.

(Plaintiff's deposition at 93.)

Based on the conflicting record, the undersigned finds that whether plaintiff was physically capable of self-administering the enema is a disputed fact.

*Conclusion*

Based on plaintiff's claim that he told defendant Nangalama that he could not administer the enema, and the conflicting evidence regarding the extent of plaintiff's shoulder injuries, the undersigned cannot find that defendant Nangalama did not act with deliberate indifference when he prescribed the self-administered enema.

4. Did Defendant Nangalama Order Adequate Monitoring of Plaintiff?

Plaintiff alleges that defendant Nangalama did not order adequate monitoring of him (plaintiff) by medical personnel while he self-administered the enema.

In his declaration, defendant Nangalama states that he required follow-up with a nurse after he prescribed the enema for plaintiff. (ECF No. 37-9 at 2.) In his declaration, Dr. Kumar states that medical records demonstrate that between September 7 through 9, 2013, plaintiff was observed by nurses at half-hour intervals. (ECF No. 37-10 at 4.) Nurses observed plaintiff writing, cleaning his cell, and talking to his cellmate. (Id. at 4-5.) There is no indication in the

nursing notes that plaintiff requested treatment for rectal tears or rectal bleeding. (Id.) The medical records indicate that plaintiff was observed every half hour during the time discussed by Dr. Kumar. (Id. at 32-34.)

In his June 1, 2017 declaration, Dr. Mallory states that it was "medically unacceptable to have returned [plaintiff] to his cell without direct monitoring by nursing staff." (ECF No. 60 at 6.) Dr. Mallory states,

> Passive monitoring, not directly interacting with the patient and asking questions about abdominal and rectal pain levels and symptoms and success or lack of, in having a bowel movement, would be medically reckless and could endanger the patient's health or result in further unnecessary injury. The patient's verbal reports about his condition are often the best indicator of a deteriorating medical condition.

(Id. at 7.)

Dr. Mallory's opinion that defendant Nangalama should have ordered nurses to monitor plaintiff by directly interacting with him versus passively observing him raises a difference of opinion between medical professionals. A difference of opinion between medical professionals does not amount to deliberate indifference. Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004). Accordingly, defendant Nangalama should be granted summary judgment as to this claim.

### 5. Qualified Immunity

The undersigned need not address qualified immunity as to those claims the undersigned finds defendant Nangalama did not violate plaintiff's Eighth Amendment rights.

As to the first prong of the qualified immunity analysis, taking the facts in the light most favorable to plaintiff, the undersigned finds that defendant Nangalama potentially violated plaintiff's Eighth Amendment rights when he prescribed the self-administered enema. The next prong of the qualified immunity analysis with respect to this claim is whether a reasonable doctor would have known that requiring plaintiff to self-administer the enema violated plaintiff's constitutional rights. Pearson, 555 U.S. at 232.

According to plaintiff, he told defendant Nangalama that he could not reach behind his back and indicated that he did not think he could perform the enema. Defendant Nangalama then allegedly told plaintiff that he (defendant) did not want to perform the enema. Defendant then

asked plaintiff to try the enema, and plaintiff agreed. Plaintiff alleges that defendant Nangalama

told him to "do the best he could." Based on these allegations, the undersigned finds that a

reasonable doctor would have known that requiring plaintiff to self-administer the enema violated

the Eighth Amendment. Accordingly, defendant Nangalama is not entitled to qualified immunity

as to this claim.

### D. Defendant Clingman

Plaintiff raises the following claims against defendant Clingman. First, plaintiff alleges

that defendant Clingman denied plaintiff's request to see a doctor on September 4, 2013. Second,

plaintiff alleges that defendant Clingman disregarded his claims of rectal tears made in his sick

call request when she permitted him to be transferred to PBSP on September 10, 2013. In his

opposition, plaintiff also claims that on September 7, 2013, he asked defendant Clingman to refer

him to a doctor, but he did not see a doctor before his transfer to PBSP.

In his complaint, plaintiff also alleges,

> 51. Plaintiff was brought two small enema bottles containing a pint
> of water to administer himself without supervision or instruction.
>
> 52. Plaintiff could not successfully administer the enema bottles as
> he has difficulty putting his arms behind his back, and his arms
> were not long enough.

(ECF No. 1 at 7.)

In her declaration, defendant Clingman clarifies that she provided plaintiff with the Fleet

Enema on September 6, 2013. (ECF No. 37-7 at 2.) Defendant Clingman states that her practice

is to educate inmate-patients under her care about the procedures for self-administering an enema

when it is prescribed. (Id.)

In his complaint, plaintiff did not raise a claim against defendant Clingman for failing to

instruct him regarding how to self-administer the enema. Defendants' summary judgment motion

also does not address this claim. To the extent plaintiff attempts to raise such a claim against

defendant Clingman in his opposition and supplemental response, such a claim is disregarded.

Plaintiff may not raise new claims in his opposition to defendants' summary judgment motion.

Moreover, in the complaint, plaintiff alleges that he could not administer the enema because of

28

difficulty in putting his hands behind his back and because his arms were not long enough, i.e., not because he did not know how to self-administer the enema.

1. <u>Alleged Failure to Refer Plaintiff to Physician</u>

Defendants argue that defendant Clingman did not act with deliberate indifference on September 4, 2013 because plaintiff saw a doctor one day later, i.e., on September 5, 2013.

In her declaration, defendant Clingman states, in relevant part,

> 4. On September 4, 2013, Mr. Bruce refused a food tray and Ensure because he felt that he was constipated. He said that he would not start eating again until he saw a doctor. A true copy of my note regarding the refusal, and the inmate refeeding education form that I provided to Mr. Bruce, is attached as Exhibit 1. I referred him to a doctor.
>
> 5. The next day, Mr. Bruce was examined by a doctor. A true copy of the physician's order that I received, directing follow-up and treatment with Colace, Milk of Magnesia, and fluids, is attached as Exhibit 2. I provided Mr. Bruce with the medication and fluids prescribed.

(ECF No. 37-7 at 2.)

The undersigned has reviewed the form attached to defendant Clingman's declaration. (<u>Id.</u> at 5.) The form contains a note dated September 4, 2013, apparently written by defendant Clingman stating that plaintiff refused his tray and Ensure because he felt constipated. (<u>Id.</u>) The note states, "He will not start refeeding until he sees the dr. He wants laxatives." (<u>Id.</u>) The note does not state that defendant Clingman referred plaintiff to a doctor. (<u>Id.</u>)

Plaintiff disputes defendant Clingman's claim that she referred plaintiff to a doctor on September 4, 2013. As stated above, in the complaint, plaintiff alleges that defendant Clingman told plaintiff that he could not be constipated because there was nothing in his bowels. (ECF No. 1 at 5.) At his deposition, plaintiff testified that after he told defendant Clingman that he had an obstruction in his bowels, she told him, "You don't have an obstruction in your bowels. You can't." (Plaintiff's deposition at 85.)

According to plaintiff, defendant Clingman failed to refer him to a doctor on September 4, 2013, because she did believe he could be constipated because he had not eaten for a lengthy period of time, due to the hunger strike.

Plaintiff's allegations suggest that defendant Clingman allegedly failed to refer plaintiff to a doctor on September 4, 2013, because she did not know that not eating for a lengthy period of time could cause constipation. In other words, defendant Clingman's alleged failure to refer plaintiff to a doctor was based on her ignorance. Defendant Clingman's alleged failure to refer plaintiff to a doctor based on her ignorance may be negligent, but it does not constitute deliberate indifference. See Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Accordingly, defendant Clingman should be granted summary judgment as to this claim.[4]

2. Alleged Disregard of Request to See a Doctor and Claims Made in Sick Call Request

*Plaintiff's Allegations*

The undersigned begins the discussion of these claims by clarifying plaintiff's allegations. In his complaint, plaintiff alleges that after his painful bowel movement at approximately 4:00 a.m. on September 7, 2013, he saw a pool of blood in the toilet. (ECF No. 1 at 8.) Plaintiff's rectum was in severe pain and bleeding. (Id.) Plaintiff alleges that over the next three days, he told numerous nurses, including defendant Clingman, that he needed to see a doctor about his torn rectum. (Id.) Plaintiff alleges "but those nurses would either indifference or tell plaintiff to submit a sick call request." (Id.)

Plaintiff alleges that he submitted a sick call request on September 7, 2013, but was not seen by a doctor. (Id.) On the morning of September 10, 2015, plaintiff learned that he was being transferred to PBSP. (Id. at 8-9.) Later that day, defendant Clingman asked plaintiff to sign and back date a document stating that he was notified of the consequences of refeeding. (Id. at 9.) Plaintiff alleges that this document was a general notice given to all hunger strike participants, but defendant Clingman forgot to give the notice to a handful of hunger strike participants scheduled for transfer back to PBSP. (Id.)

////

---

[4] Because the undersigned finds that defendant Clingman did not act with deliberate indifference, there is no need to reach the issue of whether the alleged one-day delay in seeing defendant Bobbala caused plaintiff harm. See McGuckin v. Smith, 974 F.2d 1050,1060 (9th Cir. 1992), overruled on other grounds, SMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (delay does not amount to deliberate indifference unless the delay causes further harm).

In his verified declaration submitted in support of his opposition, plaintiff alleges that on the morning of September 7, 2013, he told defendant Clingman that he needed to see a doctor because his rectum was bleeding and in a lot of pain. (ECF No. 51 at 8.) Plaintiff alleges that defendant Clingman told plaintiff that she would put plaintiff on the "doctor's line." (Id.) Plaintiff alleges that "doctor's line" means scheduled to see a doctor. (Id.) Plaintiff did not see a doctor. (Id.)

In the opposition, plaintiff alleges that on September 9, 2013, he submitted his medical request for requesting to see a doctor. (Id. at 9.) Plaintiff alleges that early on the morning of September 10, 2013, defendant Clingman came to his cell with forms containing the refeeding notice. (Id.) At this time, defendant Clingman told plaintiff that he was being transferred back to PBSP. (Id.) Plaintiff allegedly asked defendant Clingman if he would be allowed to see a doctor before the transfer, and she replied "no." (Id.) Plaintiff alleges that defendant Clingman mentioned his medical request form when she talked to him on the morning of September 10, 2013. (Id.)

Plaintiff alleges that at 9:00 or 10:00 a.m., he was put on the bus to PBSP. (Id.) During the ride, plaintiff experienced extreme pain in the area of his rectum and prostate. (Id.) Plaintiff alleges that there were feces and blood stains in his underwear when he arrived at PBSP. (Id.)

*Defendants' Evidence*

Defendant Clingman moves for summary judgment as to plaintiff's claim that she disregarded plaintiff's complaints of rectal tears on the grounds that plaintiff had left CSP-Sac for PBSP by the time she received plaintiff's request for treatment. Defendant also claims that she concluded that plaintiff would receive treatment for his complaints of rectal tears upon arrival at PBSP.

In her declaration, defendant Clingman states, in relevant part,

> 7. On September 7, 2013, Mr. Bruce refused a nursing assessment of his weight and vital signs. I witnessed this refusal. A true copy of the refusal, with my signature, is attached as Exhibit 4.
>
> 8. I received a health care services request form, or CDC Form 7362, from Mr. Bruce on September 10, 2013. He complained of rectal tears causing painful bowel movements. When I received the

31

form, Mr. Bruce had already been placed onto a bus for a transfer to Pelican Bay State Prison. A true copy of Mr. Bruce's health care services request form, including my note regarding his transfer, is attached as Exhibit 5.

9. I was not aware of Mr. Bruce's complaints relating to rectal tears before receiving the form included as Exhibit 5 to this declaration. When I received the form, I assumed that Mr. Bruce's complaints would be addressed upon arrival to Pelican Bay, and did not believe that the report of a painful bowel movement presented an emergency situation warranting removal from the bus.

(ECF No. 37-7 at 2.)

The form documenting plaintiff's September 7, 2013 refusal of examination states that plaintiff refused a nursing medical assessment to monitor the health risks associated with the hunger strike. (Id. at 11.)

The health care request form submitted by plaintiff is dated September 9, 2013. (Id. at 13.) In this form, plaintiff wrote,

As a result of recent constipation I have some rectal tear and cuts and what feels like hemorrhoids which makes bowel movement painful. I need some medication to heal and protect against infection. And I may need to call the rape crisis hotline as I am feeling violated here by my traitorous body… This is follow up to a previous visit.

(Id. at 13.)

On the form, between the words "body" and "This is a follow up…," plaintiff drew a smiling face. (Id.)

The form states that it was received and reviewed by defendant Clingman on September 10, 2013, at 0700. (Id.) Defendant Clingman wrote that plaintiff was transferred to PBSP. (Id.)

In his declaration, Dr. Kumar states that plaintiff's description of his symptoms in the September 9, 2013 health care request form did not indicate that he "had an emergent condition indicating that he could not travel." (ECF No. 37-10 at 5.)

In his declaration, Dr. Kumar also states,

16. Between September 7 through 9, 2013, Mr. Bruce was observed by nurses at half-hour intervals. (Ex. 8.) Nurses observed him writing, cleaning his cell, and talking to his cellmate. There is no indication in the nursing notes for those days that Mr. Bruce requested treatment for rectal tears or rectal bleeding.

17. On September 5, 7 and 8, 2013, Mr. Bruce refused recommended nursing assessments. (Ex. 9.)

(ECF No. 37-10 at 4-5.)

*Analysis*

In essence, plaintiff alleges that defendant Clingman's failure to refer him to a doctor on September 7, 2013, and her failure to stop his transfer to PBSP on September 10, 2013, delayed his receipt of treatment for rectal bleeding. Accordingly, the undersigned first discusses the care plaintiff received for his alleged rectal bleeding following his transfer to PBSP.

Following plaintiff's transfer to PBSP, on September 11, 2013, plaintiff saw a nurse for his complaints of rectal pain. (ECF No. 37-10 at 5.) The nurse gave plaintiff suppositories, which can reduce rectal inflammation and swelling. (Id.) The nurse also instructed plaintiff how to apply warm compresses, although plaintiff denies receiving this instruction. (Id.) On September 24, 2013, defendant Ikegbu performed an anoscopy to diagnose tears in the anus and hemorrhoids, and the examination revealed "no gross abnormalities." (Id.) Fetal occult blood tests at that time were positive, meaning that blood was detected in the stool, which was possibly the result of internal hemorrhoids. (Id.)

With regard to plaintiff's complaints of rectal tears, Dr. Kumar states that there was no other treatment indicated, other than suppositories and warm compresses, as any tears and lacerations needed to heal on their own without aggressive medical intervention. (Id. at 7.) In his June 1, 2017 declaration, Dr. Mallory does not discuss the treatment plaintiff received for his alleged rectal tears following his transfer to PBSP. Thus, plaintiff provided no expert evidence that the treatment he received for his complaints of rectal pain and discomfort following his transfer to PBSP was inadequate.

A delay in treatment that does not cause substantial harm does not constitute an Eighth Amendment violation. Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990). To succeed on his claims against defendant Clingman, plaintiff must demonstrate that the delay in receipt of the undisputed treatment he received at PBSP on September 11, 2013, i.e., suppositories, caused him to suffer substantial harm.

33

Plaintiff has provided no expert evidence demonstrating that his failure to receive suppositories from defendant Clingman, or a doctor, prior to his transfer to PBSP caused him to suffer substantial harm. According to Dr. Kumar, plaintiff's rectal injuries did not require aggressive medical intervention and needed to heal on their own. The evidence also demonstrates that by September 24, 2013, plaintiff had no "gross abnormalities," meaning that the tears were healing.

Because plaintiff has not demonstrated that he suffered substantial harm as a result of the alleged delay in his receipt of suppositories, or that his failure to see a doctor before his transfer to PBSP otherwise hindered his recovery from the rectal tears, defendant Clingman should be granted summary judgment as to these claims.

To the extent plaintiff argues that defendant Clingman should have removed him from the bus to PBSP after reading his health care request form, plaintiff has provided no expert evidence to support this claim. In his declaration, Dr. Kumar states that there is no indication in that form that plaintiff had an emergent condition indicating that he was unable to travel. (ECF No. 37-10.) After reviewing the form, the undersigned also finds that it contained no information that should have put defendant Clingman on notice that plaintiff was medically unable to travel. Accordingly, defendant Clingman did not act with deliberate indifference when she failed to remove plaintiff from the bus to PBSP.

*Qualified Immunity*

Because the undersigned finds that defendant Clingman did not violate plaintiff's Eighth Amendment rights, no further discussion of qualified immunity is required.

VIII. <u>Defendant Ikegbu</u>

A. <u>Defendants' Evidence</u>

Defendants argue that defendant Ikegbu did not act with deliberate indifference with regard to the treatment she provided to plaintiff following his transfer to PBSP. In support of this argument, defendants rely largely on the declaration of Dr. Kumar who states, in relevant part,

> 19. During an intake screening at Pelican Bay State Prison on September 10, 2013, Mr. Bruce complained that he had seen blood in his stool. (Ex. 11.) His appearance and behavior appeared

34

normal.

20. On September 11, 2013, Mr. Bruce submitted a health care form and complained of rectal tears and bleeding. (Ex. 12.) A nurse examined him for possible hemorrhoids and gave him suppositories, which can reduce rectal inflammation and swelling. Mr. Bruce was instructed to apply warm compresses to the area.

21. That same day, Dr. Ikegbu conferred with the nurse and ordered fecal occult blood tests to determine whether there was blood in Mr. Bruce's stool, which might indicate tearing. (Ex. 13.) She prescribed 600 milligrams of ibuprofen to treat unrelated complaints of shoulder pain.

22. Tests reported on September 20, 2013, indicate that blood was not detected in Mr. Bruce's stool. (Ex. 14.)

23. On September 24, 2013, Dr. Ikegbu examined Mr. Bruce relating to his complaints of constipation and blood in the stool, for hypertension, and for obstructive uropathy, a condition where the flow of urine is blocked. (Ex. 15.) Mr. Bruce reported stinging during urination and that he had the frequent urge to urinate. An anoscopy was performed to diagnose tears in the anus or hemorrhoids, and the examination revealed "no gross abnormalities." Fetal occult blood tests at that time were positive, meaning that blood was detected in his stool, which was possibly a result of internal hemorrhoids. Mr. Bruce appeared to be in "no obvious distress," was not dehydrated, pale, or jaundiced, and he was still taking Colace.

24. That same day, Dr. Ikegbu diagnosed Mr. Bruce with possible benign prostatic hyperplasic (BPH), a condition involving enlargement of the prostate that is common among older men. (Ex. 16.) Dr. Ikegbu appropriately prescribed terazosin, which is used to improve urination in men with BPH, and ordered a Prostate Specific Antigen (PSA) test to detect the presence of prostate cancer.

25. A test reported on September 25, 2013, revealed a mild PSA elevation, which may indicate BPH. (Ex. 17.) That same day, Dr. Ikegbu reviewed the PSA and diagnosed mild prostatitis, which is an inflammation of the prostate that is often caused by an infection. (Ex. 18.) She appropriately prescribed ciproflaxin, an antibiotic, to treat the infection.

26. During a November 6, 2013 follow-up appointment with Dr. Ikegbu, Mr. Bruce reported that his symptoms of frequent urination improved since he began taking ciprofloxican. (Ex. 18.) He denied blood in urine, stinging when urinating, or perineal pain. Mr. Bruce requested to discontinue terazosin because he was experiencing side effects, and Dr. Ikegbu discontinued the medication.

****

////

30. In my professional opinion, Dr. Ikegbu's diagnosis of prostatitis and BPH were supported by the medical record, and she provided appropriate treatment for those conditions that were consistent with community standards. Mr. Bruce's symptoms improved when he was treated with ciprofloxacin, and he voluntarily requested that the medication to treat BPH be discontinued. (Ex. 18.) Treatment of BPH focuses on a reduction of symptoms, and for an individual with only mild symptoms, medication is often unnecessary and may be left up to the patient's preference.

31. BPH is observed very commonly in aging men and is specifically an age-related phenomenon. Constipation is not a recognized cause of chronic BPH, nor is it a cause of prostatitis. In my opinion, Mr. Bruce's BPH was likely age-related, and was not related to the hunger strike or to constipation after the strike…

(ECF No. 37-10 at 5-7.)

In her declaration, filed in support of the summary judgment motion, defendant Ikegbu states that after the November 6, 2013 appointment, plaintiff was placed on another primary care physician's caseload. (ECF No. 37-8 at 3.)

B. Dr. Mallory's June 1, 2017 Declaration

In his declaration filed on June 1, 2017, Dr. Mallory discusses the care provided by defendant Ikegbu as follows:

19. Mr. Bruce was transferred to Pelican Bay State Prison on or about September 10, 2013, and complained upon arrival at the prison of rectal pain and bleeding, chills and night sweats, and prostate pain. [Footnote 18 omitted.]

20. Mr. Bruce informed a nurse on September 11, 2013, of his "severe rectal pain," "prostate pain," and "rectal bleeding," and "greenish discharge" dripping from his penis, along with urination problems including frequent urges, leakage and painful urination. [Footnote 19 omitted.] The nurse appears to have consulted with Dr. Ikegbu, and Mr. Bruce reports he was issued two suppositories (Anusol) to treat his complaints, but received no further treatment until September 24, 2013. (Footnote 20 omitted.)

21. Mr. Bruce was seen by Dr. Ikegbu on September 24, 2013, and Dr. Ikegbu performed a rectal exam (anoscopy) of Mr. Bruce, but Dr. Ikegbu reports that she did not find any tears, but a fecal occult test was positive for blood, which would be consistent with rectal bleeding. [Footnote 21 omitted.]

22. On September 25, 2013, Mr. Bruce was diagnosed with prostatitis and was prescribed ciprofloxican, an antibiotic to treat his prostate/urinary infection. Mr. Bruce was also prescribed

terazosin, which is used to treat urination difficulties and/or prostate problems such as enlargement. [Footnote 22 omitted.]

23. On November 6, 2013, Mr. Bruce was examined by Dr. Ikegbu, and Dr. Ikegbu ordered the terazosin discontinued due to Mr. Bruce's complaints of side effects, that interfered with his sleep, leaving him tired and unable to perform normal tasks. Dr. Ikegbu did not order any medication to address the side effect nor order a different medication to treat Bruce's urination difficulties and prostate pain, nor was any other change in treatment ordered. (Footnote 23 omitted.]

****

35. Dr. Ikegbu's failure to send Mr. Bruce for a CT Scan to further evaluate his prostate, bladder and kidneys, and her failure to order a prostate ultrasound to evaluate for hyperplasia or cancer is medically unacceptable and do not meet the standard of care for treating Mr. Bruce's complaints of prostate pain and urination problem. Mr. Bruce has never received a urological consultation. A cystoscopy was never performed to better diagnose Mr. Bruce's chronic urinary problems. Mr. Bruce should have received these examinations and treatments as part of the standard of care provided for patients with these symptoms.

36. Dr. Ikegbu's delays in treating Mr. Bruce are medically unacceptable and would have caused Mr. Brucce needless suffering and further inquiry. For example, Mr. Bruce complained of "greenish discharge" from his penis upon arriving at Pelican Bay State Prison. [Footnote 27 omitted.] Dr. Ikegbu ignored this very obvious sign of penile infection or prostate infection for an additional two weeks. This delay in treatment needlessly caused Mr. Bruce to suffer and allowed the infection to do more damage. Damage which possibly could be contributing to his current prostate and urination difficulties.

37. Another example of Dr. Ikegbu's failure to provide adequate treatment is her failure to prescribe the terazosin medication in titration. [Footnote 28 omitted.] Titration is required for this type of medication. [Footnote 29 omitted.] This failure could have been the cause of Mr. Bruce's adverse side effects. [Footnote 30 omitted.]

38. At one point Mr. Bruce's PSA (Prostate Specific Antigen) test results was at 6.6 [Footnote 31 omitted] and he complained of urinary leakage, always having a full bladder sensation, and urinary frequency. This indicates Mr. Bruce is at increased risk for either hyperplasia or prostate cancer. He should be provided a urological consult to specifically diagnose his condition and provide a treatment plan to address his symptoms with the goal of curing this condition.

39. In order to meet the standard of care for treating chronic prostate pain and urination problems, if conservative treatment is not working after 60 to 90 days, a urological consultation and

possible ultrasound, CT Scan, or cystoscopy is indicated. A family medicine doctor such as Dr. Ikegbu, would have received training on such a standard of care.

(ECF No. 60 at 4-9.)

C. <u>Analysis</u>

At the outset, the undersigned observes that Dr. Kumar and Dr. Mallory dispute whether plaintiff's BPH and prostatitis were caused by plaintiff's constipation/fecal impaction and plaintiff's alleged failure to receive proper treatment for this condition while housed at CSP-Sac. (<u>See</u> ECF No. 37-10 at 7 (Kumar declaration, ¶ 31); ECF No. 60 at 7 (Mallory declaration, ¶ 32-34).) However, plaintiff does not claim that his treatment for BPH or prostatitis should have been different based on his constipation/fecal impaction or his alleged failure to receive proper care for this condition while at CSP-Sac. Thus, whether or not plaintiff's alleged failure to receive proper treatment for his constipation/fecal impaction while housed at CSP-Sac caused the BPH and prostatitis is not relevant to his claims against defendant Ikegbu. Accordingly, the undersigned does not address this issue herein.

Turning to plaintiff's claims against defendant Ikegbu, in his June 1, 2017 declaration, Dr. Mallory identifies three alleged errors made by defendant Ikegbu in her treatment of plaintiff: 1) failure to treat plaintiff's complaints of greenish discharge made when he arrived at PBSP; 2) failing to prescribe terazosin in titration; and 3) failing to order further tests. (Mallory declaration, ¶¶ 35, 38.).

In his complaint, plaintiff also alleges that defendant Ikegbu refused to treat his torn rectum. (ECF No. 1 at 9.)

*Alleged Failure to Treat Torn Rectum—September 11, 2013*

Defendants' undisputed evidence shows that on September 11, 2013, defendant Ikegbu did not examine plaintiff. Nurse Arriola provided plaintiff with suppositories to reduce his rectal inflammation and swelling. Doctor Kumar states that defendant Ikegbu ordered a "fecal occult blood test to determine whether there was blood in Mr. Bruce's stool, which might indicate tearing." (ECF No. 37-10 at 5.) Dr. Kumar also states that, "[t]he medical record shows that he was taught to manage the symptoms with warm compresses, and was also provided medicated

38

suppositories." (Id. at 7.)  Dr. Kumar states, "[t]here was no other treatment indicated, as tears or lacerations needed to heal on their own without aggressive medical intervention." (Id.)

Dr. Mallory does not address plaintiff's claim that defendant Ikegbu failed to adequately treat his complaints of rectal pain and bleeding.

Plaintiff first argues that the fecal occult blood test ordered by defendant Ikegbu on September 11, 2013, was a colon cancer screening test, and unrelated to his complaints of rectal bleeding.  Defendant Ikebgus's record from his September 24, 2013 examination of plaintiff contains a notation stating, "Colon cancer screening via FOBTs:  negative x 3 ((09/17/13)." (ECF No. 37-8 at 10.)  This notation appears to refer to the test ordered by defendant Ikegbu on September 11, 2013.  The fact that the September 24, 2013 record describes the test as a colon screening, combined with Dr. Kumar's statement that the test "might indicate tearing," suggests to the undersigned that the test was unrelated to plaintiff's complaints of rectal pain and bleeding. For these reasons, the undersigned is not conclusively persuaded that the purpose of the fecal occult blood test ordered by defendant Ikegbu on September 11, 2013, was related to plaintiff's complaints of rectal pain and bleeding.

Plaintiff claims that defendant Ikegbu should have ordered additional treatment for his rectal pain and bleeding, either in addition to or instead of the suppositories provided by Nurse Arriola.  Defendants' expert evidence demonstrates that on September 11, 2013, defendant Ikegbu did not act with deliberate indifference by failing to order additional treatment or tests for plaintiff's alleged rectal tears, as no further treatment was warranted.  Plaintiff alleges that his condition was worse than hemorrhoids.  However, plaintiff has provided no expert evidence supporting his claim that additional or different treatment was warranted.  Accordingly, defendant Ikegbu should be granted summary judgment as to this claim.

*Alleged Failure to Treat Torn Rectum—September 24, 2013*

Defendants' evidence shows that on September 24, 2013, defendant Ikegbu performed an anoscopy to diagnose tears in the anus or hemorrhoids.  Defendant Ikegbu's record from this procedure states,

////

39

RECTAL:  Wi[th] LVN Roberts and 2 officers in attendance, the perianal region was noted to be free of hemorrhoids, fissues and tabs.  Anoscopy reveals no gross abnormalities.  DRE notes no masses.  The prostate is enlarged (3+); firm, mildly tender; no palpable nodules; medial sulcus is maintained, and rectal mucoas is fee mobile.  Examining finger is free of gross blood or mucous.  FOBT is positive.

(ECF No. 37-10 at 60.)

Defendant Ikegbu wrote that the positive FOBT was likely secondary to internal hemorrhoids.  (Id. at 61.)

In his opposition, plaintiff claims that the anoscopy performed September 24, 2013 was not done to examine his anus, but instead to examine his prostate.  Plaintiff's claim that the September 24, 2013 anoscopy did not include an examination of his rectal area is unsupported by the records as well as the declaration of his expert, Dr. Mallory.  Accordingly, plaintiff's claim that the anoscopy did not include an examination of his anus is disregarded.  See Scott v. Harris, 550 U.S. at 380 (when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a summary judgment motion.)

The undersigned also observes that at his deposition, Dr. Mallory testified that an anoscopy is an appropriate method to determine whether a patient has tears in the anus or hemorrhoids.  (Mallory deposition at 56-57.)  Dr. Mallory was also asked about the results of the September 24, 2013 anoscopy:

A:  If a patient had experienced significant rectal tearing on September 5th or 6th, 2013, would you expect there to be evidence of tearing on September 24th of 2013?

Plaintiff: Objection.  Calls for speculation.

The Witness:  It depends on the severity of the tears as a result of the passage of fecal impaction.  Tears can be shallow or deep.  Shallow ones would have already healed by then.  Deep ones would still be healing.

Q:  I would like you to look at the doctor's note on page 223.

A:  Okay.  Go ahead.

Q:  It looks like the evidence shows that Dr. Ikegbu found the perianal region to be free of hemorrhoids, fissures, or tags and the

anoscopy revealed no gross abnormalities. Would this be inconsistent with what Mr. Bruce told you?

Plaintiff: Objection as to time. Vague. Compound.

The Witness: Can you repeat the question please?

Q: Was the date found in the notes, and specifically evidence showing that an anoscopy revealed no gross abnormalities, be inconsistent with what Mr. Bruce told you regarding the nature of his symptoms?

A: No, because he could have had superficial rectal tears after he passed his large fecal impaction and they could have healed up by the 24th.

(Mallory Deposition at 57-58.)

Dr. Mallory's deposition testimony also does not support plaintiff's claim that defendant Ikegbu should have provided additional treatment for his alleged rectal tears on or after September 24, 2013.

Based on the evidence discussed above, the undersigned finds that defendant Ikegbu did not act with deliberate indifference with respect to her treatment of plaintiff's complaints of rectal tears and rectal bleeding on September 24, 2013. Defendants' unopposed expert evidence demonstrates that no further treatment of the rectal tears was required because they would heal on their own without aggressive intervention. Accordingly, defendant Ikegbu should be granted summary judgment as to this claim.

*Alleged Failure to Treat Prostate Infection on September 11, 2013*

As clarified in his opposition, plaintiff alleges that defendant Ikegbu delayed in treating his prostate related complaints on September 11, 2013. Plaintiff alleges that he complained about his prostate on September 11, 2013, but defendant Ikegbu did not provide treatment for his prostate until September 24, 2011. Thus, plaintiff is alleging that defendant Ikegbu delayed treating his prostate related complaints.

In his opposition, plaintiff alleges that on September 11, 2013, he told Nurse Arriola that he had an infection that caused a greenish discharge to drip from his penis, along with burning when urinating and urination problems, including frequent urges to urinate, leakage, and sudden urges to urinate. (ECF No. 51 at 10.) Nurse Arriola's notes from the September 11, 2013

examination of plaintiff state,

> Patient also reports of complaints of prostate. Patient spoke of drainage from his penis and was sure that there was something wrong with his prostate. Patient first said that he had good urine flow and then recanted this his flow sometimes stops, no trouble starting to urinate with occasional dysuria. No reports of frequency or inability to empty bladder.
>
> Consult with PCP for FOBT orders, possible order for IBU and possible re-start of HTN medications. Will continue monitoring BP and re-start of this medication will be addressed at CC appointment. Will be place on PCP line for further evaluation of prostate concerns.

(ECF No. 37-10 at 47.)

Defendant Ikegbu's notes regarding his September 11, 2011 conversation with Dr. Arriola do not mention plaintiff's complaints regarding his prostate. (ECF No. 37-10.) Neither Dr. Kumar's declaration nor defendant Ikegbu's declarations discuss plaintiff's complaints regarding his prostate made to Nurse Arriola on September 11, 2013. (ECF Nos. 37-8, 37-10.) In her declaration, defendant Ikegbu states,

> 10. I treated Mr. Bruce on September 11, 2013 after his hunger strike. I did not have direct contact with him at that time. Nurse Arriola, who recorded Mr. Bruce's complaints of rectal tears and rectal bleeding, relayed Mr. Bruce's symptoms to me for review. I ordered fecal occult blood tests to determine the presence of blood in Mr. Bruce's stool, which could indicate rectal tears or internal hemorrhoids. Nurse Arriola had already provided Mr. Bruce with suppositories and instructed him to use warm compresses to reduce rectal inflammation and swelling. I prescribed 600 milligrams of ibuprofen to treat his complaints of shoulder pain.

(ECF No. 37-8 at 2.)

In the supplemental reply, defendants argue that plaintiff's claim that defendant Ikegbu delayed treating his prostate is unsupported by the record. Defendants argue that plaintiff's September 11, 2013 medical request form did not request treatment for prostate issues, but rather for rectal tears and for a renewal of ibuprofen. (See ECF No. 37-10 at 44.) Defendants state that when plaintiff expressed his concerns regarding his prostate to Nurse Arriola, she wrote that plaintiff would be placed on the "PCP line" for further evaluation of those issues. Defendants argue that no facts show that plaintiff requested or required more immediate treatment or that

42

1  defendant Ikegbu was responsible for the timing of the follow-up appointment.  Finally,

2  defendants argue that plaintiff suffered no harm as a result of his delay in receiving treatment for

3  his prostate complaints.

4       While the evidence suggests that Nurse Arriola did not raise plaintiff's prostate concerns

5  with defendant Ikegbu on September 11, 2013, the undersigned cannot make this finding based

6  on the instant record.  Neither defendant Ikegbu nor Dr. Kumar address whether Nurse Arriola

7  discussed plaintiff's prostate concerns with defendant Ikegbu on September 11, 2013.

8  Accordingly, the undersigned finds that defendants have not shown that defendant Ikegbu did not

9  know of plaintiff's prostate problems on September 11, 2013.

10      The undersigned is not persuaded by defendants' argument that no facts show that

11  plaintiff required more immediate treatment, even if defendant Ikegbu was made aware of his

12  prostate concerns on September 11, 2013.  Defendants provide no expert evidence to support this

13  claim.  Moreover, the undersigned cannot reasonably infer from plaintiff's complaints regarding

14  the draining from his penis and problems urinating that his prostate problems did not require more

15  immediate attention.  In other words, the undersigned cannot find defendant Ikegbu's knowing

16  failure to treat these symptoms on September 11, 2013, did not constitute deliberate indifference.

17      While defendant Ikegbu may not have been responsible for the timing of plaintiff's

18  follow-up, as argued by defendants, the undersigned cannot find that defendant Ikegbu did not act

19  with deliberate indifference without further explanation regarding defendant Ikegbu's alleged

20  knowing failure to treat plaintiff on September 11, 2013.

21      Defendants also argue that plaintiff's delay in receipt of treatment did not cause

22  substantial harm.  As discussed above, a delay in treatment that does not cause substantial harm

23  does not constitute an Eighth Amendment violation.  Wood v. Housewright, 900 F.2d 1332, 1335

24  (9th Cir. 1990).

25      Defendants state that Dr. Mallory testified at his deposition that "the treatment with

26  ibuprofen had helped to manage any pain with prostatitis and benign prostatic hyperplasia."

27  (Mallory deposition at 61.)  Defendants state that the medical records show that defendant Ikegbu

28  reported that plaintiff was in "no obvious distress" on September 24, 2013.  (See ECF No. 37-8 at

10.)  Defendant Ikegbu also wrote that plaintiff described a greenish-slimy fluid in his urine, pain in his lower abdomen and "stinging when urinating (getting better) and poor stream."  (Id.)

Defendants also state that the medical records show that plaintiff's symptoms improved with his treatment.  In his declaration, Dr. Kumar states that defendant Ikegbu appropriately prescribed terazosin, which is used to improve urination in men with BPH.  (ECF No. 37-10 at 6.)  On September 25, 2013, defendant Ikegbu diagnosed mild prostatitis and prescribed ciprofloxacin to treat the infection.  (Id.)  On November 6, 2013, plaintiff told defendant Ikegbu that his symptoms of frequent urination had improved.  (Id.)  Plaintiff also denied blood in his urine, stinging when urinating or perineal pain.  (Id.)

In his June 1, 2017 declaration, Dr. Mallory states that the delay in plaintiff's receipt of treatment "allowed the infection to do more damage.  Damage which possibly could be contributing to his current prostate and urination difficulties."  (ECF No. 60 at 8.)  However, Dr. Mallory does not describe this damage nor does he cite any medical record supporting this claim.  Accordingly, the undersigned disregards this unsupported opinion in Dr. Mallory's declaration.  Claar v. Burlington Northern Railroad Co., 29 F.3d 499, 502 (9th Cir. 1994) (noting that a court need not credit an expert's testimony where he does not explain the basis for his conclusions).

Assuming the alleged two week delay in plaintiff's receipt of terazosin and ciprofloxican, the record contains no evidence that this delay caused plaintiff's prostatitis or BPH to worsen.  The record demonstrates that plaintiff responded to the antibiotics and the symptoms associated with the infection were resolved.

However, plaintiff alleges that he suffered pain during the two weeks he allegedly waited for treatment.  In his declaration filed in support of his opposition, plaintiff alleges that after September 11, 2013, he "continued to suffer from severe pain in my … prostate and penis which burned when I urinated."  (ECF No. 51 at 12.)  Plaintiff alleges that on September 24, 2013, he told defendant Ikegbu about his prostate pain, which was severe.  (Id.)  In contrast, the September 24, 2013 record prepared by defendant Ikegbu states that plaintiff had no obvious distress.  (ECF No. 37-8 at 10.)

////

The degree of pain and discomfort plaintiff suffered during the alleged two week delay in his receipt of medications is disputed. Plaintiff's claim that he suffered severe pain during this alleged delay may constitute substantial harm. See Wilhelm v. Rotman, 680 F.3d 1113, 1123 n. 8 (9th Cir. 2012). For these reasons, the undersigned recommends that defendant Ikegbu be denied summary judgment as to plaintiff's claim that she failed to treat his prostate complaints on September 11, 2013.

*Alleged Failure to Prescribe Terazosin in Titration*

In his June 1, 2017, declaration, Dr. Mallory states that defendant Ikegbu failed to prescribe terazosin in titration.[5] (ECF No. 60 at 8.) Dr. Mallory states that titration is required for this type of medication. (Id.) Dr. Mallory states that "this failure could have been the cause of Mr. Bruce's adverse side effects." (Id.) In support of this claim, Dr. Mallory cites an article titled "Benign Prostatic Hyperplasia: An Overview," attached to Dr. Kumar's declaration as exhibit 19. (See ECF No. 60 at 8 n.29 (Mallory declaration); ECF No. 37-10 at 99 (Kumar declaration).) This article states, in relevant part, that terazosin "require[s] titration owing to the first dose effect to reach the maximum recommended dose[]…" (ECF No. 37-10 at 104.)

Defendants do not directly address Dr. Mallory's statements regarding defendant Ikegbu's alleged failure to prescribe terazosin in titration. Regarding the discontinuation of terazosin, Dr. Kumar states that, "[t]he treatment of BPH focuses on a reduction of symptoms, and for an individual with only mild symptoms, medication is often unnecessary and may be left up to the patient's preference." (ECF No. 37-10 at 7.)

However, defendant Ikegbu's notes from September 24, 2013, indicate that she did prescribe terazosin in titration. (See ECF No. 37-8 at 14.) The relevant entry states, "Will commence terazosin 2 mg PO ZHS X 5 days, then increase to 5 mg PO QHS (*** discussed)." (Id.) Defendant Ikegbu's notes from November 6, 2013 state that plaintiff had been taking 5mg of Terazosin, but stopped "due to feeling "sinuses clogging up." (Id. at 34.)

---

[5] Titration is the "continual adjustment of a dose based on patient response. Dosages are adjusted until the desired clinical effect is achieved." See https://medical-dictionary.thefreedictionary.com/titration+dose.

Dr. Mallory's claim that defendant Ikegbu failed to prescribe terazosin in titration is not supported by the record. Accordingly, defendant Ikegbu should be granted summary judgment as to this claim.

The undersigned observes that in his declaration, Dr. Mallory also states that on November 6, 2013, defendant Ikegbu did not order any medication to address the side effects nor order a different medication to treat Bruce's urination difficulties and prostate pain, nor was any other change in treatment ordered." (ECF No. 60 at 5.)

To the extent plaintiff argues that defendant Ikegbu acted with deliberate indifference by failing to order medications to address the side effects or terazosin, by failing to order other medication to treat his urination difficulties, or by failing to order "any other change in treatment," the undersigned finds that Dr. Mallory's declaration does not support such a claim. Dr. Mallory does not identify the further medications that defendant Ikegbu should have prescribed or describe the other treatments that defendant Ikegbu should have ordered. Dr. Mallory's unsupported suggestions that defendant Ikedgbu acted with deliberate indifference by failing to order other medications and different treatments is disregarded. See Claar v. Burlington Northern Railroad Co., 29 F.3d at 502 (9th Cir. 1994) (noting that a court need not credit an expert's testimony where he does not explain the basis for his conclusions).

*Failure to Order Further Tests*

In his June 1, 2017, declaration, Dr. Mallory states that it was "medically unacceptable" for defendant Ikegbu to fail to send plaintiff for a CT Scan to further evaluate his prostate, bladder and kidneys, and to fail to order a prostate ultrasound to evaluate for hyperplasia or cancer. (ECF No. 60 at 8.) Dr. Mallory also states that plaintiff should have received a urological consultation and a cystoscopy. (Id.) Dr. Mallory states that, "In order to meet the standard of care for treating chronic prostate pain and urination problems, if conservative treatment is not working after 60 to 90 days, a urological consultation and possible ultrasound, CT Scan or cystoscopy is indicated." (Id.)

In the supplemental reply, defendants observe that after the November 6, 2013 appointment, plaintiff was placed on another primary care physician's caseload. (ECF No. 37-8

46

at 3.)  At his deposition, Dr. Mallory described ciprofloxican and terazosin as conservative

treatment.  (Mallory deposition at 69.)  Dr. Mallory testified that additional testing was warranted

90 days after plaintiff was prescribed these medications.  (<u>Id.</u> at 70-71.)  In other words, the

further testing was warranted by January 1, 2014.  (<u>Id.</u>)

Because defendant Ikegbu was no longer plaintiff's primary care physician at the time the

further tests were allegedly warranted, defendant Ikegbu was not deliberately indifferent for

failing to order these tests.  Accordingly, defendant Ikegbu should be granted summary judgment

as to this claim.

*Qualified Immunity*

With respect to qualified immunity, the only claim against defendant Ikegbu requiring

further discussion is the claim that defendant Ikegbu failed to treat plaintiff's prostate related

complaints on September 11, 2013.

Taking the facts in the light most favorable to plaintiff, the undersigned finds that

defendant Ikegbu's alleged failure to treat plaintiff's prostate complaints on September 11, 2013,

potentially violated plaintiff's Eighth Amendment rights.  The undersigned also finds that a

reasonable doctor with knowledge of plaintiff's alleged symptoms, i.e., a greenish discharge

dripping from his penis, burning when urinating, urination problems, including frequent urges to

urinate, leakage, and sudden urges to urinate, would know that delaying treatment of these

symptoms would violate an inmate's Eighth Amendment right to adequate medical care.

Accordingly, defendant Ikegbu is not entitled to qualified immunity with respect to this claim.

IX.  <u>Conclusion</u>

For the reasons discussed above, the undersigned recommends that defendants' summary

judgment motion be denied as to plaintiff's claim that defendant Nangalama violated the Eighth

Amendment by prescribing the self-administered enema and the claim that defendant Ikegbu

violated the Eighth Amendment by failing to treat plaintiff's prostate related complaints on

September 11, 2013.  Defendants' summary judgment motion should be granted in all other

respects.

////

47

Defendants did not move for summary judgment as to plaintiff's retaliation claims against defendants Bobbala, Nangalama and Clingman, or plaintiff's state law claims against defendants Bobbala, Nangalama, Clingman and Ikegbu. Defendants also did not move for summary judgment as to plaintiff's claim that defendant Nangalama violated plaintiff's Eighth Amendment rights when he allowed plaintiff to be transferred to PBSP. Following the district court's order reviewing these findings and recommendations, the undersigned will issue an order setting the remaining claims for trial.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion to strike (ECF No. 88) is granted;

2. Defendants Chaiken and Bell are dismissed; and

IT IS HEREBY RECOMMENDED that defendants' summary judgment motion (ECF No. 37) be granted but for plaintiff's claims that defendant Nanagalama violated the Eighth Amendment by prescribing the self-administered enema, and that defendant Ikegbu violated the Eighth Amendment by failing to treat plaintiff's prostate related complaints on September 11, 2013.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: August 30, 2018

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Br960.sj